IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 7, 2020

**STATE OF TENNESSEE v. ROGER TERRELL**

**Appeal from the Circuit Court for Madison County**
**No. 16-409    Kyle C. Atkins, Judge**
_____

**No. W2019-01023-CCA-R3-CD**
_____

The Defendant-Appellant, Roger Terrell, was convicted by a Madison County jury of aggravated sexual battery, in violation of Tennessee Code Annotated section 39-13-504, (count one) and seven counts of rape of a child, in violation of Tennessee Code Annotated section 39-13-522, (counts two through five and counts eight through ten).  Following a sentencing hearing, the Defendant received an effective sentence of fifty-eight-years' imprisonment.  In this appeal as of right, the Defendant raises the following issues for review:  (1) whether the evidence is sufficient to sustain each of his convictions; (2) whether the trial court erred in admitting evidence of other crimes not charged in the indictment; (3) whether the trial court erred in restricting defense counsel from questioning the victim on cross-examination concerning the origin of a urinary tract infection after the State "opened the door" on direct examination; (4) whether the trial court erred in prohibiting the Defendant from viewing the victim's Department of Children's Services (DCS) records; (5) whether the trial court erred in finding the State's comments during rebuttal closing argument were not improper; and (6) whether the trial court's order of partial consecutive sentencing was proper.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Mark Donahoe, Jackson, Tennessee, for the Defendant-Appellant, Roger Terrell.

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; Jody Pickens, District Attorney General; and Benjamin Mayo, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

This case involves the rape and sexual abuse of the minor victim by the Defendant, her stepfather, over a period of three years. When the victim's mother separated from the Defendant, the victim disclosed the sexual abuse to a close friend, and the victim's mother was later notified. Upon being examined by a nurse, the victim had injuries consistent with vaginal penetration, and she also tested positive for chlamydia. Further investigation revealed that the Defendant had chlamydia in the months prior to the victim's examination. The Defendant denied the sexual abuse allegations and theorized that the victim was sexually active with someone else. The following proof was adduced at the Defendant's trial, which took place from September 19-21, 2017.

The victim's mother began dating the Defendant in June 2010, they were married in April 2012, and eventually divorced in August 2015. The victim's mother testified regarding where she and the victim lived during this time. In August 2010, the victim and her mother lived on Pipkin Road in Jackson, Tennessee. Although the Defendant did not live with the victim and her mother at that time, he frequently visited the home on Pipkin Road and stayed overnight. In the summer of 2011, the victim and her mother moved into the Defendant's house on Old Hickory Boulevard, where the Defendant lived with his two minor sons. At that time, the victim's mother worked part-time during the day and sometimes on the weekend, while the Defendant worked at night. In May 2013, the victim's mother returned to school and worked only on the weekends. Because they could no longer afford their home, they moved in with the Defendant's mother at her home on Gadsden Road, near a gravel road called Walter Helms Cut Off. The family lived at the house on Gadsden Road for about a year, and the victim was eight or nine years old.

In June 2014, the family moved to a house in Humboldt, Tennessee, and in April 2015, the Defendant moved out over disagreements unrelated to the victim or the sexual abuse allegations. The victim's mother said she did not know about the sexual abuse between the victim and the Defendant at that time. When the victim's mother discovered the sexual abuse in January 2016, she filed a report with the Humboldt Police Department. The victim's mother took the victim to be interviewed by a caseworker with DCS and to a doctor to be tested for sexually transmitted diseases (STDs). The victim's mother confirmed that the victim was prescribed medication for chlamydia, but she was unable to take the pill form, and eventually took the liquid form of the medication. The documents from the health department were entered into evidence. The victim's mother also testified that she was tested for STDs on the same day that she took the victim to be treated, but her results were negative. She stated that she never had a STD during her relationship with the Defendant, but she was treated for a urinary tract infection shortly after she and the Defendant separated. The victim's mother clarified she was not specifically tested for a STD at that time. The victim's mother also testified that the Defendant taught martial arts

from his house, and he used sticks, nunchucks, and prop knives, some of which the Defendant made.

The victim, age thirteen at the time of the Defendant's trial, recalled events based on which house she and her family were living in at the time. She was present when her mother married the Defendant, but she could not remember the date. She believed that she and her mother were already living with the Defendant at his house on Old Hickory Boulevard for "a while" before they got married. The victim was in the second grade and living at the Old Hickory Boulevard house for a "few months" when "the things that were happening with [the Defendant]" began. Although she could not remember when she moved to the Old Hickory Boulevard house, she stated that things started happening the summer before her mother married the Defendant. At that time, the victim's mother worked during the day, and the victim stayed at home with the Defendant. The first time the Defendant touched the victim inappropriately was on a summer day while she was watching cartoons on her mother and the Defendant's bed. The Defendant "touched [the victim] on top of [her] clothes in [her] private area[,]" which she described as a "light touch." The victim got up and ran out of the Defendant's room and back to her bedroom. She was nervous and scared, and believed it was wrong.

The next day, the Defendant went into the victim's room, woke her up, and told her to come into his room. The Defendant told the victim to follow him into the bathroom, and he demanded that she remove her pants and underwear. He set her on the countertop and told the victim to "scoot up a little bit to the edge [of the counter][.]" The Defendant took off his pants and put his penis inside of the victim's vagina. The victim said this lasted longer than a "quick second[,]" and it hurt. When the Defendant stopped, the victim started bleeding from her vagina, which ran down her leg and was wiped off with a towel. The Defendant then told the victim to get on her knees, which she did, and the Defendant "stuck his [penis] in [her] mouth." The victim said the Defendant kept his penis in her mouth for "more than a second or two." When "white stuff came out" of the Defendant's penis into the victim's mouth, and the Defendant took his penis out. The victim spit the "white stuff" into the sink, and the Defendant told her to gargle mouthwash and take a shower, which she did. The Defendant allowed the victim to go back to her room, and nothing else happened that day.

A "few weeks to a month later," a second instance of sexual abuse occurred at the Old Hickory Boulevard house. The victim was in her stepbrother's room playing GameCube. The Defendant called the victim to the bathroom, where he penetrated her vaginally and forced her to perform fellatio in the same way as he had done before. The Defendant told the victim "he would chop [her] up and put [her] in a dumpster and no one would ever find [her][,]" if she ever told anyone about the abuse. The victim believed the Defendant because he had handmade knives and swords, which were displayed on the walls

of their house. The victim recalled each instance of sexual abuse occurred shortly after the victim and her mother moved into the Defendant's house on Old Hickory Boulevard but before her mother married the Defendant. The victim stated that there were "other times in between" the first and second instances of rape that she described, to which the Defendant objected and requested a mistrial based on a violation of Tennessee Rule of Evidence 404(b). The trial court conducted an extensive jury-out hearing, after which it determined that the evidence was admissible and a mistrial was not warranted.

A third instance of sexual abuse occurred after the family moved to the Defendant's mother's house on Gadsden Road. The victim said that the Defendant drove her to the mall, and she picked out a pink dress with blue polka dots from Justice, a girls' clothing store, which she wore a "few months later to [her] dad's graduation[.]" Upon their return, the Defendant "took the gravel road and he stopped in the middle and he moved the seat back and he told [her] to take [her] pants off. And he said that since he bought [her] the dress, that [she] had to do something for him." The victim explained that the gravel road was the "next street over" from their house on Gadsden Road. The Defendant "made [her] crawl over[,]" and "then he unzipped his zipper and he put his penis into [her] vagina again" for "more than a second." The Defendant then took his penis out of the victim's vagina, and he "made [her] put [her] pants back on and crawled over, and he put his penis in [her] mouth." The victim was sitting in the passenger seat at that time, and she leaned over to the Defendant's side. The victim said that she was scared not to do what the Defendant told her. "White stuff" came out of the Defendant's penis into the victim's mouth, and she spit it out the window of the car.

A fourth instance of sexual abuse occurred while the victim was living at the house on Gadsden Road. The victim was at her grandmother's house, and the Defendant picked her up. The Defendant had told the victim that a friend could come over, and the victim believed that her friend would be waiting in the Defendant's car. However, when the Defendant arrived, he told the victim they had to go and pick up her friend. On their way to pick up the victim's friend, the Defendant took the victim to the "trash place," which the victim described as a "bridge . . . [with a] crossing . . . over it" and was close to where she used to live on Pipkin Road. The Defendant drove to the backside of the facility. After moving the seat of the car back, the Defendant vaginally penetrated the victim and forced her to engage in fellatio in the same way he had done in the third instance of sexual abuse. The Defendant and the victim then picked up the victim's friend, and they went to Claire's, a young girls' store, in the mall. The victim stated that her friend was wearing her school uniform shorts that day.

The victim met with a DCS caseworker soon after she told her friend that she had been raped by the Defendant. She said this interview occurred "about two years" prior to the Defendant's trial, and she had remembered things that had happened since then.

Although the victim remembered meeting with a pediatrician, Dr. Lisa Piercey, and getting tested on the same day, she could not recall for what she was being treated. She also recalled that she was initially given medication in pill form, but she was later given a liquid medication. The victim explained that the Defendant's sons were home when the Defendant sexually abused her, but she did not believe that they ever knew what was happening to her. She went to counseling once a week until a few months before the Defendant's trial. The victim had not been treated for an STD following her first treatment for chlamydia in this case. She had been treated for urinary tract infections "a lot" while she was living with the Defendant, but she "[did not] think" she had been tested for STDs during that time.

On cross-examination, the victim confirmed that she spoke with the DCS caseworker before she spoke to the investigator or the prosecutors involved in the case. When she spoke with the DCS caseworker, she told her that "none of this happened" before her mother and the Defendant got married. Asked if she told her caseworker the truth, the victim said, "I don't know. Everything has been starting to get cleared up now that -- [.]" She also agreed that she told her caseworker, "We lived with [the Defendant's] mom two times before they got married and after they got married." She also said that "all this happened after they got married, living at [the Defendant's] mom's [house]." The State then lodged two objections during defense counsel's cross-examination of the victim. The first objection was based on defense counsel's mischaracterization of the questions that were asked of the victim by the DCS worker, which was "partially sustained and partially overruled" by the trial court. Upon further questioning of the victim about when the offenses began, defense counsel suggested it was on Gadsden Road. The State objected again, and stated, "There is nowhere in this entire interview where the victim said . . . 'This all began after I moved on to Gadsden[.]'" The State advised the trial court that defense counsel had a transcript of the victim's DCS interview and was being untruthful. Once again, the trial court instructed the State to address it on redirect and to "read the whole [statement] into evidence" since defense counsel brought it up. Defense counsel agreed and said, "Hey, I'm good with playing the whole thing . . . . I'm good." After a contentious exchange between counsel and respective admonishment of the parties by the trial court, the court overruled the objection but permitted the State to take whatever steps necessary to remedy the problem on redirect examination.

Defense counsel resumed cross-examination of the victim, and she confirmed that she told the DCS worker that "all this happened after they got married, living at [the Defendant's] mom's" home on Gadsden Road. The victim further confirmed that she told the DCS worker that none of the abuse occurred on a weekend. When defense counsel asked the victim if she told the DCS worker that her mother told her not to tell her father about this because "he gets weird about all this kind of stuff," the State lodged a third objection. Once again, the State argued that defense counsel was taking the question out

of context because the victim was not referring to sexual abuse, but rather, an incident when the Defendant hit her in the leg with a concrete cinder block. The trial court overruled the objection and instructed the State to address the issue on redirect. The victim responded she could not recall. She agreed that she had not seen the Defendant since he moved out. She also said that she had a good relationship with the Defendant's sons, her mother, and her father. The victim confirmed that she disclosed the rape to her friend only after her friend told her that she too had been abused. The victim agreed that she almost always visited her father on the weekends, but she never told her father what was happening with the Defendant. She agreed that there were "other people around all the time" when she was living with the Defendant, and none of the abuse occurred on the weekend.

On redirect examination, the prosecutor asked the victim, "Do you recall saying to the [DCS worker] that these things happened?" The question drew an objection by defense counsel, which was sustained by the trial court as to form. The trial court then instructed the State that the victim could read her interview statement into evidence because it was covered on cross-examination and the rule of completeness would allow it. Defense counsel lodged a standing objection, and the State continued with the direct examination. The State then asked the victim about portions of the interview and the victim read aloud, "And then it started happening every day almost." When the State asked the victim what she meant by "then," defense counsel lodged another objection which was sustained. The State then asked the victim, "What are you talking about?" Defense counsel objected yet again, on different grounds related to uncharged instances of sexual misconduct not included in the timeframe in the indictment or the bill of particulars. Although the trial court partially agreed, the court overruled the objection "because of the way [defense counsel] asked the victim about her prior inconsistent statements," and his suggestion through the victim's prior inconsistent statements that the sexual abuse did not begin until they lived with the Defendant's mother on Gadsden Road. The victim then read aloud the following question asked of her during her interview, "'And you said, um, that this happened in Jackson when you lived on Old Hickory?'" The victim replied, "'And then it started happening every day almost." The next question was, "'And you said, um, that this was in the summer?'" And the victim replied, "'Um, but that it happened every day that my mom was gone to work and stuff.'" In short, the victim confirmed that she told her caseworker that the Defendant began abusing her during the summer when she lived on Old Hickory Boulevard after her mother and the Defendant got married.

Madison County Sheriff's Office (MCSO) Sergeant T.J. King was assigned to the investigation into the Defendant's case. Sergeant King stated that the homes on Old Hickory Boulevard and Gadsden Road, as well as the gravel road called Walter Helms Cut Off, were located in Madison County, Tennessee. There was also a waste collection facility on Passmore Lane and another facility on Pipkin Road that are both within Madison County. Sergeant King obtained a search warrant on March 1, 2016, for the Defendant's

medical records to confirm whether he had chlamydia. The search warrant required the Defendant to "submit to the medical examination at the [Madison County Health Department] . . . within five working days of being served." The Defendant complied with the search warrant on March 4, 2016, and he tested negative for any STDs. Sergeant King also subpoenaed the Defendant's medical records from the Jackson Clinic. On cross-examination, Sergeant King stated that he did not request a subpoena for the medical records of anyone other than the Defendant.

Jerry Barker, Executive Lab Director for the Medical Center Laboratory, Jackson-Madison County General Hospital, testified as the custodian of records for the victim's medical records, which were entered into evidence. Dr. Piercey, a pediatrician specializing in child abuse, testified that she examined the victim on February 15, 2016. She identified the previously mentioned report as the medical record that she generated after she examined the victim. Dr. Piercey stated that the victim was referred to her by the victim's DCS caseworker for "suspected sexual abuse." Dr. Piercey completed a medical history of the victim, which she said was "based on any injury or potential infection that [the victim] may have" and not in "any kind of investigative role." She asked the victim "why she was there that day" to which the victim "automatically became very withdrawn and quiet and put her head down" and said, "My stepdad, [the Defendant], has been doing stuff to me since I was in third grade." Dr. Piercey asked the victim to explain further, and the victim told her that the Defendant "[t]ouched [her] over [her] clothes[,]" and every "episode" after involved "[the Defendant] putting his thing in [the victim] and [the Defendant] sticking his thing in [the victim's] mouth." The victim also told Dr. Piercey that "it happened pretty much every day after school but never on the weekends." Dr. Piercey found it "quite remarkable . . . from a medical standpoint" that the victim told her, "The first few times it hurt real bad and would always bleed, but then it stopped bleeding after he did it a few times." The victim told Dr. Piercey that the "episodes" would end "[w]hen the white stuff came out."

During Dr. Piercey's physical examination of the victim, she observed that the victim's physical exam was normal "except for her genitals[.]" Dr. Piercey described the vagina like the "face of a clock[,]" and she explained that abnormalities on the bottom half indicated injury. The victim was in "Tanner Stage 2" of development, meaning "she had just started developing pubic hair and just started developing a little bit of estrogen to her vagina." Dr. Piercey noted that "in [the victim's] hymenal exam she had a complete absence of hymenal tissue from 3:00 to 7:00" and "longitudinal vaginal ridges at 4:00 o'clock and 8:00 o'clock[,]" indicating that the victim's hymen had been torn or injured. Dr. Piercey stated that the victim did not have "active bleeding or bruising[,]" but this was not surprising to Dr. Piercey because "the last episode that [the victim] had talked about prior to the date [Dr. Piercey] saw her was nine months ago." Dr. Piercey stated that the bleeding described by the victim was related to the tearing of her hymen. She said that

hymenal injuries below the 3:00 to 9:00 o'clock position are "definitive evidence of penetrating trauma." Dr. Piercey explained that "there are very few things that penetrate vaginas" and that "accidental vaginal penetration" is "very, very rare." She explained, "[J]ust by looking you can't tell who did it or what did it. But it is very consistent with the description [the victim] gave of multiple episodes of penile penetration."

After Dr. Piercey completed her physical exam of the victim, she ordered the victim to be tested for STDs and pregnancy, which she said was standard when "there's been a history of genital to genital contact." Shanna Shearon, the Regional Epidemiologist and the Communicable and Environmental Disease Services Director for the Madison County Health Department (MCHD), testified that she was subpoenaed as the custodian of records for the MCHD, and she identified the victim's lab report results. Dr. Piercey also identified the victim's lab results, which showed a "positive result for chlamydia." Dr. Piercey stated that the Center for Disease Control (CDC) guidelines "consider that chlamydia in childhood, outside of the newborn period, is definitive evidence of sexual contact."

Rebecca Evans testified as the custodian of records for the Jackson Clinic. She identified the Defendant's medical records, which were entered into evidence. Dr. Rebecca Nass, a family physician at the Jackson Clinic, testified that she first treated the Defendant in September 2015, when the Defendant came to the clinic for "itching and burning upon urination and penile discharge." The Defendant requested to be tested for STDs, and Dr. Nass performed these tests. The Defendant's results came back positive for chlamydia on September 24, 2015, and he was notified immediately. Dr. Nass stated that the Defendant was treated for STDs on September 23, 2015, when he came in for testing, so he did not have to return for treatment. Dr. Nass saw the Defendant again on March 2, 2016, when he came back to the clinic and requested to be tested for STDs and tuberculosis. The Defendant's results were negative at that time.

On cross-examination, Dr. Nass stated that she took a medical history from the Defendant when he came to the clinic on September 23, 2015. The first line of the Defendant's history states: "The 34 year old male here for evaluation of left eye infection and possible UTI." Dr. Nass was unaware if the Defendant had been previously treated for UTIs. The Defendant's medical history that was taken on March 2, 2016, stated, "34-year-old male here for follow-up of hypertension and hypothyroidism. He had been in two different jails in the past 30 days. He wants to be tested for TB, hepatitis, and [sexually transmitted infections (STIs)]." On redirect examination, Dr. Nass stated that someone cannot get a STD without having sexual contact.

At the close of its case-in-chief, the State made the following election of offenses:[1]

| Count | Charge | Description |
|---|---|---|
| 1 | Aggravated sexual battery | Summer of 2011-Defendant touched the victim on top of her clothes, on her vagina, on the bed while she was watching cartoons. |
| 2 | Rape of a child | Summer of 2011-Defendant came in and got the victim from her bedroom, and he took her into his bedroom, into the bathroom. He put her on the counter. He penetrated her vagina with his penis and she began to bleed. |
| 3 | Rape of a child | Summer of 2011-Defendant removed his penis from the victim's vagina and had her kneel in front of him. He put his penis in her mouth and white stuff came out into her mouth. This occurred on the same day as count 2. Counts 2 and 3 occurred on the day after count 1. |
| 4 | Rape of a child | Summer of 2011[2]-The Defendant came and got the victim out of his son's room, took her back into the same bedroom, into the same bathroom. The Defendant put the victim on the counter, penetrated her vagina with his penis. The victim asked what would happen if she told anyone, and the Defendant said he would chop her up. |
| 5 | Rape of a child | Summer 2011-The Defendant removed his penis from the victim's vagina, the victim got down on her knees, and the Defendant put his penis in her mouth. He held her head on his penis, and white stuff came out. This occurred on the same day as count 4. |
| 8 | Rape of a child | Summer to autumn of 2013-The Defendant drove down the gravel road near his mother's house on |

---

[1] The State withdrew counts 6 and 7, and the trial court instructed the jury that counts 6 and 7 of the indictment had been removed from their consideration. The jury was further instructed "not speculate as to the reason for the removal of these charges or as to the absence of instructions on these charges."

[2] We note a discrepancy in the transcript as to the time frame for this election. The State initially advised, consistent with the indictment, that the offense occurred on or about the summer of 2011. However, after the trial court clarified the proper procedure for election, the transcript reflects the prosecutor's noting the election time frame for counts four and five as "December 2 of 2011." We view the December date as a clerical error and proceed with the time frame as alleged in the indictment.

| | | Gadsden Road. The Defendant made the victim take off her pants, climb over, get on top of him, and he put his penis in her vagina. |
|---|---|---|
| 9 | Rape of a child | Summer to autumn of 2013-The Defendant had the victim get off of him and crawl back into the passenger seat. He had the victim lean over, and he put his penis in her mouth. This occurred on the same day as count 8. |
| 10 | Rape of a child | Spring to summer of 2014-Soon before they moved to Humboldt, and the victim and the Defendant were in the car going to pick up the victim's friend The Defendant picked the victim up from her grandmother's house, drove to the dumpster location with the overpass going over the top near Pipkin Road. The Defendant made the victim climb over, get on top of him, and he put his penis in her vagina. This occurred on the day that the victim's friend was wearing her school uniform shorts. |

The Defendant "absolutely" denied doing anything inappropriate with the victim. The Defendant's testimony, in large part, was consistent with the testimony of the victim's mother concerning when they met, when they got married, where they lived, and when they moved, with a difference in dates of a few months. The Defendant had to adapt to raising the victim because he had only raised boys, but he "a hundred percent thought [they] had a really good relationship." The Defendant said that he and the victim's mother had a "normal marriage" until they separated, and they were "sexually active three or four times a week." After the divorce was initiated, he began to date other women. He went to the doctor on September 23, 2015, after spending the weekend with his girlfriend and noticing that his eye was hurting and swelling. He was treated in the office that day, but he insisted that he did not request to be tested for STDs, and there was no discussion about STDs during his visit. He also said that he told Dr. Nass that he had been through a "messy divorce[,]" and he "freely listed the people [he'd] been dating[.]" He found out a few days later that he had tested positive for chlamydia, and he contacted the health department and his sexual partners. He returned to Dr. Nass's office on November 4, 2015, and he was clear of STDs at that time. The Defendant continued to date and work until he was arrested in January 2016. He stated that he had been charged in both Madison County and Gibson County, and he served "some days" in both places. He was required by a warrant to be tested for STDs, but he wanted "another test as comparative data in case there was something wrong with [the court-ordered test]." He said that he was "stunned" and "completely floored" by the allegations, and he never sensed any problems between him

and the victim's mother or him and the victim. The Defendant also insisted that he had never threatened the victim or any member of her family.

When asked if he knew why the victim would make up allegations against him, the Defendant said, "Anything that I said would be a guess . . . . [he had] no idea if anything [had] ever happened to [the victim] by somebody else's hand[.]" He also said that he did not know why the victim would be holding a "grudge" against him, and he opined that this could have started when the victim's friend told the victim that she had been abused, prompting the victim to make up allegations about the Defendant sexually abusing her. He said he believed that the victim was "sexually active with someone." He said that he accepted the testimony given at his trial as fact, but he "absolutely [did] not know who did it."

The Defendant had practiced martial arts since he was eight years old, and he maintained weapons related to his martial arts practice, including swords, nunchucks, knives, and throwing stars. He assumed the victim knew how good of a martial artist he was, but he did not believe that the victim ever felt threatened by him. The Defendant said that his older son moved out because he wanted to spend more time with his mother, but the Defendant also said that his older son had a conflict with the victim and was a "bit jealous of her and the way I treated her." He explained, stating, "I mean, I treated [the victim] as an equal. And [my older son] very much liked to be the center of attention." He stated that his relationship with his older son was "pretty strained" at the time of his trial. The Defendant denied giving the following statement to Dr. Nass and called it an error in his chart: "He complains of penile itching and burning. He complains of discharge, has had this problem for about three months. He is going through a divorce and suspects his wife has been unfaithful. He requests testing for STIs[.]" He stated that the victim was "obviously" a liar.

The Defendant was arrested on January 27, 2016 in Gibson County, remained in jail for six or seven days, turned himself into Madison County after charges were brought against him, and spent six more days in jail in Madison County. He was served with the search warrant for a urinalysis at the next court meeting, and he went to the doctor "as soon as [he] could[.]" Records showed that the Defendant was released from jail in Madison County on February 17, 2016. The Defendant did not know how much time elapsed between his release from Gibson County and his arrest in Madison County, but he opined that it was about a week. He was served with the search warrant, which required him to go to the health department on March 1, 2016. He went to the Jackson Clinic on March 2, 2016, and the records showed that he was negative on March 4, 2016; however, the Defendant insisted that he did not have these results when he went to the health department to comply with the search warrant. He agreed that his attorneys told him to get privately tested for STDs for comparison.

The jury convicted the Defendant of aggravated sexual battery (count one) and seven counts of rape of a child (counts two through five and eight through ten). Based on the judgments, the trial court imposed a sentence of eight years' imprisonment for the aggravated sexual battery conviction in count one, which was to be served consecutively to a twenty-five-year concurrent term of imprisonment for the rape of a child convictions in counts two through five, which was to be served consecutively to another twenty-five-year term of imprisonment for the rape of a child convictions in counts eight, nine, and ten, for an effective sentence of fifty-eight years' imprisonment. The Defendant was also ordered to be placed on the sex offender registry and community supervision for life following the expiration of his sentence. The Defendant filed a motion for new trial on November 27, 2017, and an amended motion for new trial on February 6, 2019. The trial court denied the motion by written order on May 2, 2019. The Defendant filed an untimely notice of appeal on June 7, 2019.

## ANALYSIS

As an initial matter, we must address the untimeliness of the Defendant's notice of appeal. Tennessee Rule of Appellate Procedure 4(a) states that "the notice of appeal required by Rule 3 shall be filed with the clerk of the appellate court within 30 days after the date of entry of the judgment appealed from . . . ." However, it also states that "in all criminal cases the 'notice of appeal' document is not jurisdictional and the timely filing of such document may be waived in the interest of justice." Tenn. R. App. P. 4(a). Here, the Defendant filed his notice of appeal on June 7, 2019, thirty-five days after the trial court denied his motion for new trial. The Defendant fails to explain this untimely filing. However, given that the notice of appeal was untimely by only five days and considering the nature of the Defendant's convictions, we conclude that the "interest of justice" is best served by granting a waiver in this case. See Tenn. R. App. P. 4(a); see also Crittenden v. State, 978 S.W.2d 929, 932 (Tenn. 1998).

We further observe at the outset several deficiencies in the appellate record, which are fatal to three of the six issues raised by the Defendant.[3] The Defendant contends that the trial court erred in restricting defense counsel from questioning the victim on cross-examination about the underlying cause of a UTI when there was evidence that she had been in contact with "boys other than the Defendant" and after the State introduced evidence of the victim having been treated for a UTI on direct examination. He argues that the trial court's ruling denied him the right to confront his accuser through meaningful cross-examination. The Defendant also contends that the trial court erred by prohibiting

---

[3] For ease of reference, we have renumbered the issues in this opinion. These issues were presented in the Defendant's brief as issues three, four, and seven.

him from viewing the DCS investigative file containing the forensic interview of the victim, which "potentially showed prior inconsistent statements made by the [victim]." Finally, the Defendant asserts that the trial court abused its discretion in imposing consecutive sentences, arguing that the trial court failed to consider his lack of an extensive criminal history and that his sentence of fifty-eight years is excessive. As to these three issues, the State argues, and we agree, that the Defendant has waived plenary review.

The appellant has a duty to prepare a record that conveys "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). "Where . . . the record is incomplete, and does not contain a transcript of the proceedings relevant to an issue presented for review, or portions of the record upon which a party relies, this Court is precluded from considering the issue." State v. Roberts, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1998) (citing State v. Groseclose, 615 S.W.2d 142, 147 (Tenn. 1981); State v. Jones, 623 S.W.2d 129, 131 (Tenn. Crim. App. 1981)). "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." State v. Orozco, No. M2017-00327-CCA-R3-CD, 2018 WL 2372197, at *10 (Tenn. Crim. App. May 24, 2018) (citing Tenn. Ct. Crim. App. R. 10(b); see also Tenn. R. App. P. 27(a)(7). "In the absence of an adequate record on appeal, we must presume that the trial court's ruling was supported by the evidence." State v. Bibbs, 806 S.W.2d 786, 790 (Tenn. Crim. App. 1991) (citing Smith v. State, 584 S.W.2d 811, 812 (Tenn. Crim. App. 1979); Vermilye v. State, 584 S.W.2d 226, 230 (Tenn. Crim. App. 1979)).

As to the first issue, none of the pre-trial hearing transcripts have been included in the record on appeal. Specifically, the hearing transcript on the Defendant's "Motion for Exculpatory Evidence" held on May 23, 2017, and on the State's motion in limine to exclude evidence pursuant to Tennessee Rule of Evidence 412. By failing to include the transcripts of these hearings on appeal, the Defendant has precluded this court from review. See State v. Chaves-Abrego, No. M2018-01880-CCA-R3-CD, 2020 WL 3273047, at *5 (Tenn. Crim. App. June 18, 2020) (holding that the Court was precluded from reviewing the issue for plain error because the appellant failed to include a transcript of a pre-trial hearing on the admissibility of evidence in the appellate record and did not seek to supplement the record with the transcript). In addition, the Defendant argues that he was denied the right to confront his accuser through meaningful cross-examination, but this issue is also waived because the Defendant has raised it for the first time on appeal. Tenn. R. App. P. 36; State v. Howard, No. E2014-01510-CCA-R3-CD, 2015 WL 4626860, at *8 (Tenn. Crim. App. Aug. 4, 2015), aff'd in part, rev'd in part, 504 S.W.3d 260 (Tenn. 2016) (citing State v. Johnson, 970 S.W.2d 500, 508 (Tenn.Crim.App.1996)).

The second issue is similarly waived because the Defendant failed to include the sealed DCS records, which were admitted as Exhibit 6 at the Defendant's trial, in the record

on appeal. We acknowledge that mid-trial the trial court expressly noted that these records were to be exhibited to the trial at the close of the proof; however, the record does not reflect this was done. Without these records, we are unable to determine the potential impeachment value or the alleged exculpatory nature of the material. See State v. Merriweather, No. M2002-01817-CCA-R3-CD, 2003 WL 354506, at *3 (Tenn. Crim. App. Feb. 14, 2003) (stating that an issue raised on appeal would be waived for the failure to include exhibits in the record on appeal). Additionally, the fact that the Defendant did not challenge this issue based on the Confrontation Clause at trial or in his motion for new trial is another ground for waiver of this issue. The State contends that we should conduct a plain error analysis as to the first two issues; however, without the relevant transcripts or exhibits, we decline to do so.

The third issue is waived because the Defendant failed to include a transcript of the sentencing hearing in the record on appeal. The only references to the Defendant's sentence in the record on appeal are from the State's notice of enhancement factors, the motion for consecutive sentencing, and the judgments. We have no explanation of the trial court's reasoning for imposing consecutive sentencing. See State v. Pittman, No. W2016-00745-CCA-R3-CD, 2017 WL 2179959, at *6 (Tenn. Crim. App. May 16, 2017) (concluding that the defendant waived his challenge of the trial court's imposition of consecutive sentences by failing to include the transcript from the sentencing hearing with the record); see also State v. Troutman, 979 S.W.2d 271, 274 (Tenn. 1998) (failure to include trial transcript on appeal resulted in waiver of sentence challenge); State v. Chadwick, No. M2008-02270-CCA-R3-CD, 2010 WL 2025463, at *4 (Tenn. Crim. App. May 21, 2010). Accordingly, we must presume that the trial court's consecutive sentencing determination was appropriate. We will now address the remaining three issues raised in the Defendant's brief.

**I. Sufficiency of the Evidence.** The Defendant contends the evidence is insufficient to sustain each of his convictions. He argues the victim's testimony did not establish a "consistent version or timeline of events" and that the facts do not prove that he gave the victim an STD.[4] The State contends, and we agree, that the evidence is sufficient to sustain each of the Defendant's convictions.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279

---

[4] The Defendant also argues in this section of his brief that excluding evidence of other sources for the urinary tract infection or sexually transmitted disease combined with allowing testimony of other instances of uncharged conduct had the effect of swaying the jury to convict him. However, as previously discussed, the appellate record did not include the necessary transcripts for review of this issue; accordingly, it is similarly waived.

S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

As relevant here, aggravated sexual battery is "unlawful sexual contact with a victim by the defendant or the defendant by a victim," and the victim is less than thirteen (13) years of age. Tenn. Code Ann. § 39-13-504. "Sexual contact" includes:

> the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification.

Id. § 39-13-501(6). "'Intimate parts' includes semen, vaginal fluid, the primary genital area, groin, inner thigh, buttock, or breast of a human being." Id. § 39-13-501(2).

- 15 -

Rape of a child is the "unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." Id. § 39-13-522. "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's or any other person's body, but the emission of semen is not required[.]" Id. § 39-13-501(7).

Viewing the evidence in the light most favorable to the State, the Defendant began sexually abusing the victim during the summer of 2011, when she was six or seven years old. The first incident occurred soon after the victim and her mother moved into the Defendant's house on Old Hickory Boulevard the summer before her mother and the Defendant got married. The victim said that while she was watching cartoons on her mother and the Defendant's bed, the Defendant "touched [her] on top of [her] clothes in [her] private area." The victim also testified as to four instances of sexual abuse during which the Defendant penetrated her vaginally and forced her to perform fellatio. The day after the Defendant touched the victim on her private area, the Defendant woke the victim up and told her to come into his room. The Defendant took the victim into the bathroom, made the victim take off her pants and underwear, and put her on the counter. The Defendant then penetrated the victim vaginally and forced her to engage in fellatio. A "few weeks to a month later[,]" when the victim was in the Defendant's son's room playing video games, the Defendant called the victim into the bathroom again, where he vaginally penetrated her and forced her to engage in fellatio in the same way. After this incident, the victim asked the Defendant what would happen if she told someone, and he said "he would chop [her] up and put [her] in a dumpster and no one would ever find [her] again."

The next incident occurred when the family lived at the house on Gadsden Road, which was in the summer of 2013. On the return trip home from shopping at the mall, the Defendant stopped on Walter Helms Cut Off, a nearby gravel road, and vaginally penetrated the victim and forced her to engage in fellatio while in the car. Shortly before the family moved to a home in Humboldt, the fourth incident of sexual abuse occurred at the home on Gadsden Road. Based on the testimony of the victim's mother, they moved to the home in Humboldt in June of 2014. The Defendant picked up the victim from her grandmother's house, and on their way to pick up the victim's friend, the Defendant stopped at a "trash place" with a "bridge . . . crossing . . . over it" near Pipkin Road. The Defendant once again vaginally penetrated the victim and forced her to engage in fellatio while in the car in the same way he had done before. In April of 2015, the Defendant moved out of the house in Humboldt after separating from the victim's mother while the victim was out of town on spring break. He had no further contact with the victim's mother or the victim.

Around six months later, on September 23, 2015, the Defendant tested positive for chlamydia, and he was treated. In January of 2016, the victim told her friend that the Defendant had sexually assaulted and raped her. The authorities were eventually notified and, on February 15, 2016, Dr. Piercey examined the victim and observed that she had "a complete absence of hymenal tissue from 3:00 to 7:00" and "longitudinal vaginal ridges at 4:00 o'clock and 8:00 o'clock[,]" indicating that the victim's hymen had been torn or injured. The victim had "definitive evidence of penetrating trauma." On the same day, the victim was tested for STDs, tested positive for chlamydia, and she was treated.

The Defendant takes issue with the victim's statement to her DCS caseworker that the abuse began after her mother married the Defendant, which was on April 12, 2012, because the indictment "charge[d] criminal conduct in 2011 in counts one through five." He is also aggrieved with the timeline of events "regarding the STDs," and asserts that these facts do not prove that he gave the victim an STD. In this regard, the victim testified that she was living in the house on Old Hickory Boulevard for a "few months" when "the things that were happening with [the Defendant]" started. The Defendant and the victim's mother testified that the victim and her mother moved into the Defendant's house on Old Hickory Boulevard in the summer of 2011. The victim also testified that she had corrected herself about what happened to her as the case progressed and her memories came back, but she agreed that she was telling the jury the truth as she remembered it. The jury heard the testimony surrounding these events, as well as the arguments of counsel on this issue, and it resolved any inconsistencies in favor of the State, as it was entitled to do. Finally, the Defendant argues, "the accumulation of errors is a sufficient basis to overturn [his] conviction[s]." State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010) (citations omitted). Because we have determined that the trial court did not err on any of the Defendant's aforementioned issues, we need not consider the cumulative effect of the alleged errors. Id. at 77 ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings."). The Defendant is not entitled to relief.

**II. Tennessee Rule of Evidence 404(b).** The Defendant asserts that the trial court erred in allowing the State to introduce evidence of uncharged sexual contact between the Defendant and the victim without initially conducting a hearing outside the presence of the jury. In response, the State contends the trial court substantially complied with the requirements of Tennessee Rule of Evidence 404(b), and properly admitted evidence of Defendant's other sexual misconduct during the time frame alleged in the indictment.

Prior to trial, the Defendant filed a "Motion in Limine to Exclude 404(b) Evidence" and a "Motion for a Bill of Particulars." The State filed a response to the bill of particulars motion noting that the indictment charged the relevant time frame, that the Defendant had been provided with open file discovery, and that the State had furnished the Defendant with all the information it had concerning the time frame of the charged offenses. Shortly

- 17 -

thereafter, the State filed a motion to amend the indictment, which narrowed the time frame of the offenses in counts 8 and 9 from "on or about 2012" to "on or about the summer-autumn of 2013," and count 10 from "on or about 2012-2013" to "on or about the spring-summer of 2014." An order reflecting the amended indictment was entered on September 19, 2017. The record does not contain a response from the State to the Defendant's 404(b) motion or a hearing transcript on the same.

During trial, while the State was questioning the victim about counts four and five, the following exchange occurred:

[STATE]: Do you remember if you bled or not the second time? Is that – Hang on a second. Is that the second time it happened or was there maybe other times in between those two times?

[VICTIM]: Other times in between those.

[STATE]: All right. But do you remember this because of what you said to him?

[VICTIM]: Yes.

[STATE]: All right. And on this time that you say that to him and he responds to you in that way---

Defense counsel objected based on Rule 404(b) and moved for a mistrial. During the ensuing bench conference, defense counsel advised the trial court that he had raised this issue pre-trial by motion, which was not heard based on the State's assurance that no evidence of any other crimes or misconduct would be introduced at trial. In response, the State explained that the Defendant's 404(b) motion was "boilerplate" and that it did not consider the motion to cover the narrow exception for other sexual misconduct committed against a child sexual abuse victim during the time frame as alleged in the indictment. After hearing preliminary arguments, the trial court excused the jury. Defense counsel and the State then provided the court with extensive case authority and argument in support of their respective positions. Upon review, the trial court overruled the objection and denied the Defendant's request for a mistrial. In doing so, the trial court determined that the evidence was admissible to show course of conduct, the history of the relationship between the Defendant and the victim and lack of an accident, and it found that the prejudicial value of the information did not outweigh the probative value. During the same jury-out hearing, the trial court reconsidered the issue and reasoned as follows:

- 18 -

I do think it's not 404(b). I don't think its prejudicial value substantially outweighs the probative value of it.

When you read [State v. Rickman, 876 S.W.2d 824, 828 (Tenn.1994)] it also indicates that there might -- that there is a -- I don't know if it's quite an exception, but that the State is allowed some leeway when there is not a time specific date in the indictment.

You're dealing with a young person. They're granted a little leeway in discussing various incidents that might have occurred during that time period, because if there is -- if it's an instant within that time period it's relevant. And relevant evidence under 401 is admissible.

During the victim's redirect examination, she read from her forensic interview with her DCS caseworker, in which she said, "And then it started happening every day almost." The Defendant objected on the same grounds, which the trial court overruled, finding that the Defendant had opened the door to this testimony by asking the victim about prior inconsistent statements on cross-examination. While referencing the same interview, the victim said, "[I]t happened every day that my mom was gone to work and stuff." Additionally, during Dr. Piercey's testimony, she said that the victim told her that "it happened pretty much every day after school but never on the weekends." At the close of its proof, the State elected offenses as outlined above, and the trial court so instructed the jury.

The gravamen of the Defendant's claim is that the State violated Rule 404(b) of the Tennessee Rules of Evidence in admitting evidence of other sexual misconduct committed by the Defendant against the victim in this case. See Tenn. Rule Evid. 404(b) ("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes."). However, in State v. Rickman, the Tennessee Supreme Court reaffirmed the special rule applied in State v. Brown, 762 S.W.2d 135, 137 (Tenn.1988), and State v. Shelton, 851 S.W.2d 134, 136 (Tenn.1993), which allows for the admission of evidence of other sex crimes when an indictment is not time specific and when the evidence relates to sex crimes that allegedly occurred during the time as charged in the indictment. 876 S.W.2d at 829. The Rickman rule applies to "the prosecution of criminal acts committed against young children who are frequently unable to identify a specific date on which a particular offense was committed." Id. 828. In cases such as these, the State is required to elect at the close of its proof the particular incident for which the conviction is being sought. Id. Where the case is based solely on generic evidence, i.e. when the victim cannot recall specific incidents or dates of abuse due to the lengthy period of abuse, a modified unanimity instruction must be given to the jury. State v. Qualls, 482 S.W.3d 1, 17 (Tenn. 2016). The

court reasoned, "[u]nlike evidence of prior crimes excluded by [] Rule 404(a) & (b), evidence of a prior sex crime that is necessarily included within the charge of the indictment is also necessarily relevant to the issues being tried and, therefore, is admissible." Rickman, 876 S.W.2d at 829. (internal citation and footnote omitted). The court further emphasized in State v. Qualls, that "the general prohibition [against propensity evidence] has been relaxed in the sex crimes context, specifically in cases where the defendant is alleged to have committed sexual offenses over a lengthy period of time against young children who are often unable to identify the dates on which particular acts were perpetrated." 482 S.W.3d at 9. Accordingly, where the indictment charges that sex crimes occurred over a span of time, rather than on specific dates, then evidence of unlawful sexual contact between the defendant and the victim allegedly occurring during the time charged in the indictment is admissible. Id. (internal quotations omitted).

Applying the above law to the instant case, we conclude that the trial court properly denied the Defendant's motion for a mistrial. For relief, the Defendant relies on cases that involved child sex crimes where the indictments were date specific. State v. Montgomery, 350 S.W.3d 573, 586 (Tenn. Crim. App. 2011); State v. Jeff Carter, No. M2009-02399-CCA-R3-CD, 2010 WL 5343212, at *12 (Tenn. Crim. App. Dec. 16, 2010) (reversal based on improper use of Rickman as a trial tactic); State v. Frank Daniel Peters, No. 03C01-9312-CR-00405, 1994 WL 678541, at *3 (Tenn. Crim. App. Dec. 6, 1994). Here, the indictment, as amended, charged the Defendant with sex crimes that occurred over a span of time; specifically, aggravated sexual battery on or about the summer of 2011 (count one); rape of a child on or about the summer of 2011 (counts two through seven); rape of a child on or about the summer-autumn of 2013 (counts eight and nine); and rape of a child on or about the spring-summer of 2014 (count ten). Although there were "other times in between" the first (counts two and three) and second (counts four and five) occurrences of rape, the victim recalled the particulars of the second occurrence because the Defendant threatened to chop her up and put her in a dumpster, if she disclosed the abuse. This sexual misconduct was well within the span of time charged in the indictment and therefore admissible under Rickman.

As to the remaining comments, as fully outlined above, during cross-examination of the victim, defense counsel utilized portions of her DCS interview as a prior inconsistent statement to impeach her testimony regarding the time frame of the offenses. Defense counsel pressed the victim about her statement to the DCS worker that the offenses occurred after her mother and the Defendant were married. The State objected and argued that defense counsel was mischaracterizing the interview and taking the victim's statements "wildly" out of context. The trial court overruled the objection, noting that the State could address the issue during its redirect examination. On redirect examination, the State solicited testimony from the victim, consistent with her DCS statement, that "'it started happening every day almost,'" and "'it happened every day that my mom was gone to work

- 20 -

and stuff'" in an effort to rehabilitate the victim. The Defendant then objected, arguing that these comments were other acts of sexual abuse outside the time frame alleged in the indictment. The trial court overruled the objection because the statement was covered in cross-examination, was admissible under the rule of completeness, and required in the interest of justice. Upon our review, we agree with the trial court, and conclude that the Defendant is not entitled to relief. See State v. Boyd, 797 S.W.2d 589, 593-94 (Tenn.1990) ("Where specific questions and answers taken out of context do not convey the true picture of the prior statement alleged to be inconsistent, it is unfair to permit reference to isolated, unexplained responses by the witness and there is no error in allowing the statements to be placed in context.").

III. **Improper Prosecutorial Argument.** The Defendant argues the trial court erred in overruling two defense objections to comments made by the State during rebuttal closing argument. He claims the State "inappropriately referred to and commented on the veracity of counsel for the Defendant" and "insinuated that the Defendant could have asked questions and could have disproven a certain fact." The State contends, and we agree, that the trial court properly overruled the Defendant's objections because the comments were in response to Defendant's closing argument.

"Closing argument is a valuable privilege that should not be unduly restricted." State v. Stephenson, 195 S.W.3d 574, 603 (Tenn. 2006) (citing State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001)). The trial court has substantial discretion in controlling the course of arguments and will not be reversed unless there is an abuse of that discretion. Id. In addition, prosecutorial misconduct does not constitute reversible error absent a showing that it has affected the outcome of the trial to the prejudice of the defendant. Id. (citing Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001)). However, an attorney's comments during closing argument "'must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried.'" State v. Gann, 251 S.W.3d 446, 459 (Tenn. Crim. App. 2007) (quoting State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978)). In order to be entitled to relief on appeal, the defendant must "show that the argument of the prosecutor was so inflammatory or the conduct so improper that it affected the verdict to his detriment." State v. Farmer, 927 S.W.2d 582, 591 (Tenn. Crim. App. 1996).

Although not exhaustive, Tennessee courts have recognized five general areas of potential improper prosecutorial argument: (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing personal beliefs or opinions as to the truth or falsity of any testimony or the guilt of the defendant; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) injecting issues broader than the guilt or innocence of the accused; and (5) arguing or referring to

facts outside the record unless the facts are matters of common knowledge. See State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

This court must consider the following factors when determining whether the argument of the prosecutor was so inflammatory or improper to negatively affect the verdict:

> (1) the conduct complained of viewed in the light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper arguments; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength and weakness of the case.

State v. Chalmers, 28 S.W.3d 913, 917 (Tenn. 2000) (citations omitted).

As to the first allegation of misconduct, during his closing argument defense counsel made the following statement about the verdict form:

> You'll have several different issues -- On Count 1, for instance – I'm just showing you Count 1 – aggravated sexual battery, and there's a line for guilty or not guilty. Not guilty, go to the next line. That's – that's another offense under the same set of facts. Guilty or not guilty, go to the next line. That's the next page, that's assault by offensive or provocative physical contact that the Judge talked about.

> So you can consider all of those under each count. Each one is to be considered. You have to go to each one. You have to make a finding.

> Now if, for instance, for some reason you found guilty on an offense, say, in this -- the offensive or provocative physical contact, you find him guilty there, you stop and go to the next count.

Based on this comment, the State lodged an objection, and out of the presence of the jury, it argued that defense counsel was "instructing [the jury] contrary to the law and [the] instructions that they were given." Defense counsel disagreed with the State's characterization, and the trial court instructed the State that it could "point that out" in its rebuttal closing argument. During its rebuttal closing argument, the State responded,

> [STATE]: You were told with regard to the verdict form that you were going – you were supposed to take this verdict form and that you were required to

go through the whole form and read everything in here and make your decision like on everything in here.  That's not – that's not exactly true.  I'm sorry, this is the verdict form.  That's not exactly true.

You're going to be given an instruction, and what you're -- what you're instructed to do – You'll have the whole verdict form, but what you're going to be instructed to do is to start at the count that's charged in Count 1, and if you find him guilty of that count, you stop.  You do not go the lesser includeds.  **You do not go through every charge in there unless you first find him not guilty of that count.  [Defense counsel] knows that.  And he knows that he incorrectly told you.** (emphasis added)

[DEFENSE COUNSEL]:  Objection. That – that's inappropriate.

[TRIAL COURT]:  Overruled.  Go ahead.

[STATE]:  And he knows that he incorrectly told you what you're supposed to do with that verdict form.

Taken in context, we conclude that these comments were in direct response to Defendant's closing argument and not improper.  The Defendant is not entitled to relief on this issue.

As to the Defendant's allegation that the State "insinuated that the Defendant could have asked questions and could have disproven a certain fact," during his closing argument defense counsel stated:

All right.  Let me go back to that again.  [The Defendant] last saw [the victim] March 2015.  [The Defendant] doesn't have it until September 23rd of 2015.  [The victim] tests positive February 15, 2016, eleven months after [the Defendant] has been thrown out of the house.

[The Defendant] takes a court-ordered test on March 4th and he doesn't have it then.  And he hasn't had it since he cleared November the 4th of 2015.

. . .

So that's the timeline that's important.  It shows that it's impossible for [the victim] to get this STD from [the Defendant], because for 11 months

between the time he left, before she had it -- And he didn't get it until several months after he left the residence in September of the same year.

Now, here's the rest of that story. They want you to believe that [the Defendant] gave it to [the victim]. That's what they want you to believe. But they also want you to believe that he didn't give it to his wife. Again, that's – It's impossible.

Defense counsel also stated, "Because we know [the Defendant] couldn't have done it because he didn't give [the victim] the STD. He didn't do – It's just – It's – it's physically impossible. So somebody, according to the medical evidence – And I'm not going to argue against that. According to the medical evidence –" At this point, the State objected, and the trial court sustained the objection.

In its rebuttal closing argument, the State commented as follows:

[STATE]: The last contact between [the Defendant] and [the victim] was prior to spring break 2015, March 2015, March or April 2015.

[The Defendant] is positive for chlamydia in September, on September 23rd, 2015. [The victim] is positive for chlamydia in January of 2016. That's the evidence that was presented to you.

[Defense counsel], not a medical expert, said to you during his closing statement, "Therefore, it is impossible that [the Defendant] gave [the victim] chlamydia."

There is no evidence in the record that that's true. He said that repeatedly, and there is no evidence.

And there were two doctors who testified, two medical experts who testified, and he could have asked them that question –

[DEFENSE COUNSEL]: Objection.

[TRIAL COURT]: Overruled. Go ahead.

[STATE]: He could have asked them that question if he wanted to.

The trial court held a hearing outside the presence of the jury, during which defense counsel argued that the State's comment improperly shifted the burden of proof. The State

countered that it was responding to the Defendant's closing argument. The trial court overruled the Defendant's objection and instructed the jury that "statements, arguments, and remarks of counsel are intended to help you in understanding the evidence and applying the law, but they are not evidence."

The Defendant's reliance on State v. Hodge, 989 S.W.2d 717, 723-25 (Tenn. Crim. App. May 26, 1998) (concluding that prosecutor's closing argument comments referring to the absence of defendant's wife at trial was error because there was no proof establishing that she was a missing witness) and State v. Daniel Perez, No. W2016-02483-CCA-R3-CD, 2018 WL 625125, at *11-12 (Tenn. Crim. App. Jan. 30, 2018) (concluding that prosecutor's remarks on cross-examination were improper because the State failed to lay the proper foundation under Delk v. State, 590 S.W.2d 435, 440 (Tenn. 1979)), in support of this issue is misplaced. Here, the bulk of the Defendant's closing argument focused on the timeline of events, and defense counsel repeatedly stated that it was "impossible" for the Defendant to have given the victim chlamydia. At times during his closing, defense counsel misstated the last date the victim had contact with the Defendant as March 2014, an eighteen-month gap between his September 2015 positive test for chlamydia, to bolster his argument that the victim was sexually involved with someone else. Based on his theory and timeline, defense counsel questioned the viability of the medical testimony but quickly abandoned that argument upon the State's objection. In response, the State did not draw an adverse inference from or allude to the absence of a witness or testimony. Instead, the State recounted the timeline based on the evidence, noted defense counsel's erroneous characterization of the proof, and directly responded to it with the evidence that was presented at trial. While we do not condone remarks by the State noting that defense counsel failed to ask a certain question, the State's remarks here were invited by or responsive to defense counsel's misleading closing summation. Accordingly, in the overall context of the closing argument, we conclude that the State's rebuttal closing argument was not improper, and the Defendant is not entitled to relief.

## CONCLUSION

Based on the above reasoning and analysis, we affirm the judgments of the trial court.

_____
CAMILLE R. MCMULLEN, JUDGE